UNITED STATES DISTRICT COURT                    c
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

STACEY LYNN KENNEDY,                 CIVIL ACTION NO. 2:21-CV-03758
Plaintiff

VERSUS                               JUDGE CAIN

COMMISSIONER OF SOCIAL               MAGISTRATE JUDGE PEREZ-MONTES
SECURITY ADMINISTRATION,
Defendant

## REPORT AND RECOMMENDATION

Before the Court is Stacey Lynn Kennedy's ("Kennedy's") appeal of the denial of Social Security disability insurance benefits ("DIB") by the Commissioner of Social Security (the "Commissioner").  ECF No. 1.

Because ALJ complied with the regulations in considering the medical opinions and because the ALJ's decision is supported by substantial evidence, the Commissioner's decision should be AFFIRMED, and Kennedy's appeal should be DENIED and DISMISSED WITH PREJUDICE.

## I.   Background

Kennedy filed an application for period of disability and DIB under Title II and Part A of Title XVIII of the Social Security Act (the "Act") on May 9, 2019.  ECF No. 8-1 at 164.

Kennedy alleges a disability onset date of July 9, 2017, due to cervical disc displacement and radiculopathy, degenerative discs, and lower back pain.  *Id.* at 192. Kennedy's claims were initially denied by the Social Security Administration ("SSA")

on October 21, 2019, and again upon reconsideration on January 30, 2020.  *Id.* at 62-73, 76-88.

Kennedy's application was heard before an ALJ on December 2, 2020.  ECF No. 8-1 at 33.  Kennedy appeared with William Stampley, a vocational expert ("VE").  *Id.* at 35.  She also appeared with attorney Cherie Burns ("Burns").  *Id.*  The ALJ denied Kennedy's claims on May 7, 2021.  *Id.* at 17-26.  The ALJ determined that Kennedy was not disabled under the Act, finding at step four that Kennedy could perform her past relevant work as a cashier and manager as actually and generally performed, and her work as a customer service manager as actually performed.  *Id.*

On August 20, 2021, the Appeals Council denied Kennedy's request for review.  *Id.* at 6.  The ALJ's December 2, 2020 decision thus became the final decision of the Commissioner.  *Id.* at 33.

Proceeding *in forma pauperis*, Kennedy filed this appeal for judicial review.  ECF No. 1.  Kennedy argues that the Commissioner's decision was based on legal error and is not supported by substantial evidence.  ECF No. 1 at 1-2.  Kennedy specifically asserts that the ALJ failed to properly consider Kennedy's subjective complaints.  ECF No. 10 at 3.  She further asserts that the ALJ's residual functional capacity ("RFC") determination is not supported by substantial evidence and is the product of legal error because the ALJ failed to properly evaluate the opinions of non-examining state agency consultants James Pihnkston, Ph.D. ("Pihnkston") and Carissa L. Bokelberg, Psy. D. ("Bokelberg").  *Id.*

The Commissioner filed a brief in response to Kennedy's appeal. ECF No. 12. Kennedy filed a brief and reply brief. ECF Nos. 10, 15. Kennedy's appeal is now before the Court for disposition.

A. **Medical Records**

1. **Advanced Orthopedic and Sports Medicine**

On October 7, 2016, Kennedy complained of tailbone pain over the last five months. ECF No. 8-1 at 270. She reported difficulty with activities of daily living and standing. *Id.* Physical exam by Dr. Jeffrey Traina ("Dr. Traina") revealed intact rang of motion of the lumbar spine; left and right paraspinal musculature tender to palpation; normal posture; normal lumbar spine stability; 5/5 lower extremity strength bilaterally, and intact sensation; negative straight leg raises bilaterally. *Id.* She had an x-ray of her coccyx that was normal. *Id.* at 271. Dr. Traina's clinical impression was a diagnosis of herniated disc. He recommended a lumbar spine x-ray, gave samples of micronized anti-inflammatories, and scheduled laser to her back and coccyx. *Id.*

On October 13, 2016, Kennedy presented for x-ray of the lumbar spine, which was within normal limits. *Id.* at 274.

On November 4, 2016, Kennedy followed up, complaining of pubic symphysis pain of 7/10, and difficulty walking, sitting, and standing. *Id.* at 272. Her condition was noted as stable since her last visit. *Id.* She was counseled for smoking. And Dr. Traina's impression was inadequately controlled herniated disc of the lumbar spine. *Id.* She reported she is still symptomatic in the low back and coccyx. *Id.* He found

no radicular pain and normal lumbar spine x-rays. *Id.* She reported relief with micronized anti-inflammatories, which he recommended she continue. *Id.*

On June 20, 2017, Kennedy had an MRI of the cervical spine for cervical radiculopathy with history of previous fusion at the C5-6. *Id.* at 278, 334.

### 2. Physical Therapy Services of West Louisiana

On July 13, 2017, Kennedy received an initial evaluation for physical therapy for cervical radiculopathy and cervical pain. *Id.* at 282. Her cervical spine MRI revealed C5, C6, C7 disc protrusion. *Id.* She rated her pain at 7/10 and 10/10 at its worst. *Id.* She complained of pain increased with lying supine, looking over her left shoulder, and prolonged periods of sitting and standing. *Id.*

Examination revealed a forward head; rounded shoulders; increased thoracic kyphosis; guarded transitional movements; limitations in cervical range of motion; marked tenderness along the suboccipital musculature; trigger points in the levator scapulae, upper traps, and paraspinals; a mild increase in cervical pain with distraction testing; increased pain with cervical compression without increase in radicular symptoms; and marked tightness in the suboccipital musculature, cervical paraspinals, pectorals, and upper traps. ECF No. 8-1 at 282. She also had reduced 4+/5 shoulder flexion; 4/5 abduction; 4/5 elbow flexion on the left; 4+/5 elbow flexion on the right; 4/5 wrist flexion and extension on the left; and 4+/5 wrist flexion and extension on the right. *Id.* at 2. Claimant has 4/5 grip strength bilaterally. *Id.*

The impression was cervical radiculopathy with significant range of motion and postural strength deviations and mild strength deficits. *Id.* The plan was to continue physical therapy for four to six weeks. *Id.* at 283.

Kennedy received physical therapy treatment through September 14, 2017, when she was discharged to home therapy. ECF No. 8-1 at 284-307. Her discharge summary noted Kennedy improved significantly with range of motion but she had some continued intermittent radicular symptoms into her right upper extremity. *Id.* at 286. She met or partially met her goals concerning her range of motion. *Id.* She reported some continued intermittent headaches. *Id.*

### 3. Alexandria Neurosurgical Clinic

On June 14, 2017, Kennedy had her initial encounter with Dr. Gregory Dowd ("Dr. Dowd") with a chief complaint of neck and bilateral arm pain post-motor vehicle accident on May 12, 2017. ECF No. 8-1 at 330. She complained of worsening pain radiating into both arms to the hands, intermittent degrees of numbness in her hands bilaterally, and increased headaches and muscle tension. *Id.* She stated her symptoms were aggravated by standing, working, and using her arms often. *Id.* She had a previous cervical fusion in 2009 and said she did well. *Id.* Kennedy reported no pain prior to this episode. *Id.* Neurological examination revealed normal results. *Id.* She had cervical spinal tenderness and cervical paraspinal spasm, but no SI joint or trochanteric tenderness, and normal cervical and lumbar range of motion. *Id.* at 331. She had negative Spurling's sign and negative straight leg raise testing. *Id.*

5

Dr. Dowd's assessment was cervical radiculopathy; cervical sprain; status post C5-6 fusion in 2009; status post-motor vehicle accident on May 12, 2017; and neck and bilateral arm pain, suggestive of radiculopathy, no focal deficit, and no relief with medication to date. *Id.* at 330. Dr. Dowd recommended a cervical MRI, a trial Medrol dose pack, and a short course of Norco. *Id.*

On June 29, 2017, Kennedy treated with Dr. Dowd to discuss her MRI results. *Id.* at 306. She reported tolerance of her medication, some reduction of pain, less between her shoulder blades but more at the upper aspect of her neck. *Id.* It was worse with neck rotation. *Id.* She reported no radiation down her arms. *Id.* Examination revealed Kennedy was in moderate discomfort, had cervical spine tenderness, limited cervical range of motion, negative straight leg raising test, negative Spurling's test, intact and symmetric motor function, normal sensory examination, intact reflexes, and stable gait without assistive device. *Id.* Dr. Dowd's impression of her cervical MRI was solid C5-6 fusion, C6-7 disc bulge with some CSF effacement, and slight progression compared to her 2014 study. *Id.* Dr. Dowd's diagnosis was cervical radiculopathy; initial cervical sprain; status post C5-6 fusion in 2009; status post May 12, 2017 motor vehicle accident; and neck pain likely due to C6-7 disc protrusion with no active radiculopathy or focal deficit. *Id.* He recommended she continue anti-inflammatories and initiate a trial of physical therapy. *Id.*

On August 23, 2017, Kennedy treated with Dr. Dowd for follow-up status post physical therapy. *Id.* at 301. Kennedy reported improvement in neck pain and range

of motion with physical therapy, and an increase in frequency and severity of headaches. *Id.* Examination revealed cervical paraspinous tenderness, limited cervical range of motion, negative straight leg testing, negative Spurling's test, intact and symmetric motor function, normal sensory examination, intact reflexes, and stable gait without an assistive device. *Id.* Dr. Dowd's impression remained essentially the same. *Id.*

On September 27, 2017, Kennedy saw Dr. Dowd for follow-up. *Id.* at 324. Kennedy reported improvement in pain and spasms with Flexeril and Duexis. *Id.* She still had a degree of discomfort with increased activity. *Id.* She stated the pain is sometimes severe, but was hesitant to consider further treatment. *Id.* Examination revealed the same as previous findings. *Id.* Dr. Dowd's assessment was unchanged. *Id.* Dr. Dowd recommended she continue her anti-inflammatory and Flexeril, and he noted Kennedy was okay to return to work at this time. *Id.*

On November 16, 2017, Kennedy saw Dr. Dowd for follow-up. *Id.* at 322. Kennedy reported continued neck pain and headaches, that she had stopped taking Flexeril due to a drowsy feeling, and that the Duexis was tolerable but expensive. *Id.* She reported some shoulder discomfort but no arm pain. *Id.* Her examination revealed the same as previous findings and she continued to have stable gait without an assistive device. *Id.* Dr. Dowd's assessment remained the same except for a notation that Kennedy's headaches and neck pain persisted despite Flexeril and Duexis. *Id.* He discussed treatment options including injections, surgery, and pain

management. *Id.* Kennedy was not interested in surgery and was hesitant to consider injections. *Id.* She requested a pain management referral. *Id.*

### 4.    Dr. Nicole Churchman

On May 14, 2019, Kennedy treated with Dr. Churchman for follow-up, complaining of worsening pain with the neck and back, migraines, limited mobility to stand or sit without the pain being excruciating. *Id.* at 350. She reported she must get up in the night due to her arms and hands going to sleep, and she is unable to lift and carry over fifteen pounds or do anything above her head. *Id.* She complained of fatigue, memory loss, and concentration problems. *Id.* Physical examination revealed that Kennedy was overweight but ambulating normally. *Id.* at 351. Neurological examination revealed normal motor strength bilaterally. *Id.* Dr. Churchman's impression was migraine, fatigue, and memory impairment. *Id.* She ordered labs and advised Kennedy would return to care if needed regarding the results. *Id.* at 352.

On June 19, 2019, Kennedy followed up complaining of fatigue and forgetfulness. *Id.* at 348. Kennedy stated she had been struggling to stay awake, feeling overwhelmingly tired sometimes while driving. *Id.* Kenney reported that she slept okay in the night and thinks that she feels rested. *Id.* Dr. Churchman's assessment noted normal labs related to memory impairment. *Id.* Dr. Churchman requested an MRI of the brain and referred Kennedy to a neurologist. *Id.* The July 13, 2019 MRI of the brain was negative and normal. *Id.* at 353.

On September 18, 2019, Kennedy was seen by Dr. Ernesto Kufoy ("Dr. Kufoy") for a disability exam.  *Id.* at 366.  She reported neck pain, migraines, tingling numbness in her arms, and back pain radiating to the tail bone.  *Id.*  She stated her condition is worsened by sitting, walking, and continued movement, and her symptoms are relieved by rest.  *Id.*  Her neurological exam was normal.  *Id.* at 368. She had normal reciprocal gait pattern, good hand-eye coordination, no balance problems, no palpable muscle spasms, normal muscle strength, and normal muscle tone.  *Id.*  Sensory examination was normal and straight leg testing was negative bilaterally.  *Id.*  It was noted that she could lift, carry, and handle light objects, but was unable to squat.  *Id.*  Kennedy was able to rise from a sitting position without assistance, and had no difficulty getting up and down from the exam table. *Id.*  She had normal lumbar spine range of motion and limited cervical spine range of motion. *Id.*  Her lumbar and cervical spine x-rays were within normal limits, with presence of fusion of C5-6.  *Id.*  She had normal tandem walking and could hop on one foot bilaterally.  *Id.* 370.  She could dress and undress adequately.  *Id.* She was observed to have moderate limitations due to pain with squatting and no other limitations. *Id.* at 373.

On November 12, 2019, Kennedy saw Dr. Churchman for follow-up and complained of issues with depression for the past couple of months and not resting well.  *Id.* at 397.  She felt it was partly due to being "in pain all the time."  *Id.*  She complained of pain in her lower back and said she has been trying to get pain management.  *Id.*  Physical examination revealed irregular gait and tenderness to

palpation to the lower lumbar spine. *Id.* at 398. Otherwise, her physical exam was normal. *Id.* Dr. Churchman's assessment was degeneration of the lumbar intervertebral disc, and depressive disorder. *Id.*

On July 8, 2020, Kennedy treated with Dr. Churchman for a woman's well check. ECF No. 8-3 at 89. She reported she had an EMG and neuro evaluation, started on Elavil for the nerve pain and chronic migraine headaches, had some improvement with her headaches, and had more testing ordered per neuro. *Id.* at 90. She reported fatigue, joint pain, and frequent or severe headaches and memory lapses. *Id.* Dr. Churchman recommended she continue with her medication for migraines. *Id.* at 91. She noted an impression of C5-6 radiculopathy with chronic denervation of the deltoid and ulnar neuropathy at the level to the left elbow. Dr. Churchman also adjusted Kennedy's medication to Cymbalta for major depressive disorder to deal with the chronic pain. *Id.*

### 5. <u>Sabine Urgent Care</u>

On November 4, 2019, she treated with urgent care for lower back pain. *Id.* at 380. She reported she broke her tailbone fifteen years ago and was in a motor vehicle accident two years ago. *Id.* It was noted she had no numbness or tingling of her extremities. *Id.* Physical examination revealed tenderness of the back and neck, tenderness to the right lower back down her buttocks, worse with bending forward. *Id.* at 381. Impression was right sided sciatica for which she was given an injection of Decadron. *Id.*

On July 31, 2020, Kennedy treated with urgent care for mid-back pain and a swollen left foot. ECF No. 8-3 at 100. Physical examination revealed no abnormality of the extremities or joints, no pain with walking, and no lymphadenopathy. *Id.* at 101. Mild swelling to the left lower leg was noted. *Id.* Kennedy was assessed with lower extremity edema and chronic low back pain, pending an MRI appointment.

On March 23, 2020, Kennedy saw Nurse Practitioner Lindsay Ross ("Ross") for symptoms of neck pain radiating to her shoulders and arms bilaterally. ECF No. 8-3 at 59. Kennedy reported her symptoms are from an old and a recent motor vehicle accident. *Id.* An MRI of her cervical spine revealed a prior fusion at the C5-C6 with no recurrent stenosis or neurocompression at that level, and otherwise mild spondylotic disc and endplate change and facet arthropathy at as described with no significant spinal stenosis, cord compression, or foraminal impingement. *Id.*

### 6.    Neuromedical Clinic of Central Louisiana

On June 1, 2020, Kennedy was examined by Dr. Gonzalo Hidalgo ("Dr. Hidalgo") for a Nerve Conduction Study/Electromyography ("NCS/EMG") of her bilateral upper extremities related to complaints of neck pain and tingling in the upper extremities. ECF No. 8-1 at 401. The findings were compatible with right C5-6 chronic radiculopathy and left mild to moderate neuropathy at the level of the elbow, with no evidence of myopathy. *Id.* at 402.

### B.    Administrative Hearing

At the December 2, 2020 telephonic administrative hearing, Kennedy's attorney Burns noted records from November 17, 2017 to present date were

outstanding from Alexandria Neurological. ECF No. 8-1 at 38. The ALJ held the record open for two weeks for receipt of those records. *Id.* at 39.

Burns argued that Kennedy, age 47, last worked on July 9, 2017 when she was 43 years old and ten months due to severe impairments including a C-5, C-6 fusion in 2009, from which she still has pain and limitations. *Id.* at 39-40. She also argued Kennedy had a motor vehicle accident and cervical sprain on May 12, 2017, which aggravated her previous fusion. *Id.* at 39-40. She stated Kennedy has suffered from tailbone pain for a number of years, low back pain, bilateral arms neuropathy, and polyneuropathy on the right side from her cervical column. *Id.* at 40.

Burns argued Kennedy works part-time as a substitute teacher. *Id.* Kennedy chooses the day she wants to work, sometimes only working a half-day depending on how she feels. *Id.* She only deals with older kids and works about one to two days per week, either a four-hour half day or eight-hour full day. *Id.* at 43. Kennedy testified she earns $67 per day as a substitute teacher. *Id.*

Kennedy lives with her fiancé and 15-year-old son. *Id.* at 41. She also has three adult children; two live nearby. *Id.* Kennedy explained that she doesn't like to drive because it is hard for her to turn to the left to look in the mirror or behind her after she was rear-ended in a motor vehicle accident. *Id.* at 41-42.

Burns stated Kennedy has limitations with range of motion in her neck, and with sitting, standing, and walking. *Id.* at 40. She cannot hold her head down to read a book and cannot look up. *Id.* at 42. If she does any of those things for too long, she gets a migraine. *Id.* Her migraines last about a day if she catches them early and

12

treats them with medication and an ice pack.  *Id.*  If not, her migraines can last three to four days.  *Id.*  She has neuropathy in her hands, causing her to drop things.  *Id.* at 43-44.  She has hand tremors, and her arms feel heavy.  *Id.* at 44.  Kennedy testified she is unable to lift her daughter's baby and must sit if she has to hold him with a pillow under her arm.  *Id.*  The heaviest she can lift is five to ten pounds.  *Id.*

Kennedy has an associate's degree in medical billing and a bachelor's degree in healthcare management.  *Id.*  When she was in the motor vehicle accident in May of 2017, she was working at Vernon Home Health as a billing manager and intern administrator.  *Id.*  There, she would not really lift anything but occasional boxes of files if they had a health inspection.  *Id.* at 45.  She was employed there for five years. *Id.*  She was on thirteen- or sixteen-weeks short-term disability when she was working there.  *Id.*  She testified she earned $27,197 in 2017 and worked until July 9, 2017.  *Id.*

Prior to that, Kennedy worked as a customer service manager at Walmart for five years.  *Id.* at 46.  She finished her degree and then got the job at Vernon Home Health.  *Id.*

Regarding her limitations of taking care of her personal needs, Kennedy only takes a shower if her fiancé is home.  *Id.*  She cannot hold a blow dryer to dry her hair.  *Id.*  She wakes up early for work to let it air dry.  *Id.*  It is hard for her to brush her hair.  *Id.* at 46-47.  Her fiancé helps her with getting dressed when putting on a bra or a cami, or anything she must pull or put her arms behind her back.  *Id.*

Kennedy testified she only works at her son's school so that he can drive. *Id.* at 47. Her 25-year-old daughter comes over once a week to dust and mop. *Id.* Her 20-year-old helps with dinner at least five nights a week. *Id.*

Kennedy is not involved in social activities. *Id.* at 48. She used to help in the children's room at church, but stated none of them go anywhere now. *Id.* She last helped in the spring of 2020. *Id.*

She obtains treatment for back pain and is prescribed 600 milligrams ("mg") of Gabapentin, three times daily. *Id.* She is also prescribed 800 mg of Cymbalta for depression and chronic pain. *Id.* at 48-49. She also takes Amitriptyline for depression and migraines, which she started in June, once a day. *Id.* at 49. All of them make her tired, but she doesn't sleep well at night. *Id.* She wakes up every three hours. *Id.* She sleeps an hour here and there during the day. *Id.* at 50. If she works that day, she sleeps for a couple of hours after work. *Id.*

Kennedy testified that her migraines keep her from working full-time. *Id.* With her migraines and depression, she is no longer social. *Id.* She is unable to drive because she is tired, and her arms go numb and fall asleep. *Id.* She cannot type, look down, or look at a computer screen for eight hours like she used to. *Id.* She cannot stand like she did when she worked at Walmart. *Id.* She is unable to stand for eight hours and has to stop a lot during the day every ten to fifteen minutes. *Id.*

Kennedy testified that since her fusion she has balancing issues and cannot stand stationary. *Id.* at 50-51. She described it as feeling like she's stepping over something, there won't be anything there and she will fall, as if her right side will

give way.  *Id.* at 51.  She can sit ten to fifteen minutes before she must move around due to pain and discomfort.  *Id.*  Her lower back and tailbone hurt to sit straight in a regular chair.  *Id.* at 52. Her arms hurt if she tries to do too much.  And looking down pulls the muscles in her neck.  *Id.*

Kennedy injured her tailbone when she was pushed down the stairs in a domestic incident.  *Id.*  It prevents her from sitting for extended periods of time in a regular chair and is aggravated when riding an hour to see her doctor.  *Id.*  She must use an ice pack or heating pad.  *Id.*  She also uses a TENS unit.  *Id.*  She uses the TENS unit four to five times a week.  *Id.* at 52.  She uses her heating pad every night, more often if she has been in a car for a long period of time.  *Id.* at 53.

When she was a customer service manager, she was over the whole front end of the store, including the service desk, the money center, the cashiers, and the car pushers.  *Id.*  She regulated their breaks and lunches, would do price checks, made change and reset the registers at night.  *Id.*  She started part-time as a cashier and six months later was made a customer service manager.  *Id.* at 54.  When she was a customer service manager, she had to lift and carry on average 15 pounds.  *Id.*  As a cashier, she had to lift about 20 to 25 pounds.  *Id.* at 55.

At Vernon Home Health, Kennedy was the billing manager, and an intern administrator the last year there.  *Id.*  She was an intern administrator as she had to finish her degree.  *Id.*  There, the heaviest weight she had to lift and carry was five pounds.  *Id.*  She sat most of the time with a lot of computer work and paperwork.  *Id.*

15

Kennedy testified that her depression is brought on by her chronic pain. She enjoys being busy, and now that she's not able to be busy, it causes her depression. *Id.*

The VE testified that Kennedy's past work consists of cashier, check, part-time, DOT[1] number 211.462-014, light, semi-skilled, SVP level 3; customer service manager, DOT number 299.137-010, medium, skilled, SVP level 7, light physical range; and title manager, department, DOT number 189.167-022, sedentary, skilled, SVP 7. *Id.* at 57.

The ALJ asked the VE to assume a hypothetical individual with Locker's past jobs described, limited to light exertional level with no more than occasional overhead reaching bilaterally. *Id.* at 57-58. The ALJ asked the VE If, based on those limitations, whether that hypothetical individual could perform the demands of Kennedy's past work. *Id.* at 58.

The ALJ asked the VE to further assume the hypothetical individual would be off-task at least fifteen percent of the workday, for any reason including additional breaks, medication side effects, or symptoms of severe impairments. *Id.* The ALJ asked whether that hypothetical individual could perform the demands of Kennedy's past work. *Id.* The VE testified that issue is not addressed in the DOT, but that it is his opinion in his past experience dealing with employers, being off-task fifteen percent or more of the day would lead to termination. *Id.*

---

[1] Dictionary of Occupational Titles.

The ALJ asked the VE to further assume that the hypothetical individual would miss at least two days of work per month on a consistent basis, being whole or half-days. *Id.* at 59. As to whether the hypothetical individual could perform the demands of Kennedy's past work, the VE testified that in his onionin it would be an excessive rate of absenteeism, which is too much based on his past experience with employers. *Id.*

Burns had no further questions for the VE. *Id.* He was given two weeks to get the outstanding medical records submitted. *Id.*

## C.    ALJ's Findings

To determine disability, the ALJ applied the five-step sequential process outlined in 20 C.F.R. §§ 404.1520(a), 416.920(a). The sequential process required the ALJ to determine whether Kennedy: (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (citing *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

An applicant bears the initial burden of showing that she is disabled. Under the regulations, this means the claimant bears the burden of proof on the first four

steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant can perform work in the national economy. *See Greenspan*, 38 F.3d at 237.

Here, the ALJ found Kennedy met the insured status requirements of the Act through December 31, 2022. ECF No. 8-1 at 19. She found that Kennedy had not engaged in substantial gainful activity since her alleged onset date of July 9, 2017. *Id.* In step two and three of the sequential evaluation, the ALJ determined that Kennedy suffered severe impairments of cervical degenerative disc and C5-6 radiculopathy with denervation of the deltoid and left elbow neuropathy. *Id.* at 20. But the ALJ concluded that Kennedy did not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in Appendix 1. *Id.* at 21.

The ALJ determined Kennedy retained the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) except with no more than occasional overhead reaching bilaterally. *Id.* at 22. She concluded that Kennedy's RFC did not preclude her from performing any past relevant work. *Id.* at 26. The ALJ concluded that Kennedy had not been under a disability, as defined in the Act, from July 9, 2017, the alleged onset date, through the date of her decision. *Id.*

## II.   Law and Analysis

### A.    Scope of Review

In considering Social Security appeals, the Court is limited by 42 U.S.C. § 405(g) to a determination of whether "substantial evidence" exists in the record to

support the Commissioner's decision, and whether there were any prejudicial legal errors. *See McQueen v. Apfel*, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. *See Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. *See Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. *See Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987); *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than a court. *See Allen v. Schweiker*, 642 F.2d 799, 801 (5th Cir. 1981); *see also Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992). A court does have authority, however, to set aside factual findings that are not supported by substantial evidence, and to correct errors of law. *See Dellolio*, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988); *Dellolio*, 705 F.2d at 125.

**B.**    **The ALJ properly considered Kennedy's subjective complaints and her assessment is supported by substantial evidence.**

Kennedy contends that the ALJ failed to properly consider and rejected her subjective complaints.  ECF No. 10 at 3-4.  She asserts the ALJ provided a summary of the objective evidence regarding her physical and mental impairments, but as to the "other" factors improperly considered her treatment and activities of daily living. *Id.*  Kennedy argues that the ALJ's characterization of her treatment and activities does not provide a basis to reject her subjective complaints.  *Id.* at 5.

Kennedy further contends that the ALJ stated that Kennedy maintained the functional ability to perform her daily activities such as performing her personal care needs, preparing simple meals, and shopping online for her necessities.  *Id.*  Kennedy states the ALJ cited her ability to maintain part-time work in a school setting as evidence inconsistent with her claim of disability.  *Id.*  And she contends that the ALJ "built no bridge between [Kennedy's] acknowledgement that she could make quick meals like sandwiches and cereal with his finding that she could perform sustained work activity on a daily basis for 8-hours per day, five days per week."  *Id.*  Kennedy cited her function report and testimony concerning her limitations and the severity of her symptoms.  *Id.* at 5-6.

Kennedy argues that the ALJ failed to explain how her daily activities demonstrate that she can perform work, day in and day out, under stressful conditions.  *Id.* at 7.  And she contends the ALJ characterized her treatment as conservative, although she underwent a cervical spinal fusion in 2009 and was involved in a motor vehicle accident in May of 2017.  *Id.*  Kennedy asserts the ALJ's

characterization is not supported by substantial evidence and is harmful error. *Id.* at 8.

Under SSR 16-3, an ALJ analyzes a claimant's subjective complaints under a two-step process.  First, the ALJ determines whether there is a medically determinable impairment that could reasonably be expected to produce the plaintiff's alleged symptoms.  20 C.F.R. § 1529(c); SSR 16-3.  Then, the ALJ evaluates the intensity and persistence of the plaintiff's symptoms to determine the extent to which a plaintiff's symptoms limit her ability to perform work related activities. *Id.*  In considering the

Here, the ALJ noted careful consideration of the entire record and considered all symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 1529 and SSR 16-3p.  ECF No. 8-1 at 22.  The ALJ thoroughly summarized the objective medical evidence concerning Kennedy's physical and mental impairments. *Id.*  The ALJ also considered Kennedy's testimony, and the statements and reports of record. *Id.* at 22-23.  The ALJ found that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but found that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record. *Id.* at 23.

The ALJ noted that the claimant's statements were only partially consistent with the objective medical evidence, noting that the claimant has a history of

musculoskeletal impairments, but that the record showed she had improved symptoms with treatment. *Id.* The ALJ also noted she had a history of back pain which resulted in cervical back surgery, more than a decade prior to the alleged onset date. *Id.* The ALJ observed that Kennedy reported her involvement in a May 2017 auto accident which she reported caused neck and back pain. *Id.* But the ALJ observed that images of her cervical spine in June 2017 showed her prior fusion was still solid, but she had a disc bulge at the C6-7 with some effacement, although no other abnormalities were noted. *Id.*

The ALJ stated that based on the benign objective evidence, Kennedy treated conservatively with physical therapy. *Id.* And the ALJ noted that, with conservative treatment, the records showed that Kennedy maintained the functional ability to perform her daily activities. *Id.* The ALJ observed that Kennedy reported in her Function Report that she could perform her personal care needs, prepare simple meals, and shop online for her necessities. *Id.* The ALJ observed that Kennedy maintained her finances, attended church regularly, and drove a car. *Id.* The ALJ noted Kennedy's testimony that she maintained the ability to work part-time in a school setting with children, demonstrating her ability to engage with others on a regular basis, as well as function outside of her home. *Id.* The ALJ determined this is consistent with finding that Kennedy maintained the ability to perform basic work activities. *Id.*

The ALJ went through the objective medical evidence and observed any consistency or inconsistency with Kennedy's statements. *Id.* at 23-24. While

Kennedy alleged her impairments limited her functional ability to sit, stand, lift, reach, walk and squat, physical examinations with her continued conservative treatment showed greater functional ability. *Id.* at 23. The ALJ noted that physical examination revealed stable gait with intact motor function, negative straight leg raises, and negative Spurling's. *Id.* at 24. The record showed she had normal muscle tone, normal movement of all her extremities and normal station. *Id.* However, less optimal findings showed she continued to have paraspinous tenderness, moderate discomfort, and limited cervical range of motion. *Id.* The ALJ observed that the evidence of Kennedy's ability to perform daily activities, including cooking, personal care needs, and shopping supported the findings.

The ALJ also noted that Kennedy continued conservative treatment and that physical examination noted an irregular gait and tenderness over her lumbar spine in November of 2019. Still she maintained normal muscle tone and strength as well as benign neurological findings. *Id.* The ALJ found that the objective record evidence showed no increased intensity or frequency in Kennedy's medical treatment, and that when she did receive treatment, it was generally conservative and routine and the objective findings were consistently minimal. *Id.*

Contrary to Kennedy's assertions, the ALJ provided a summary of the record evidence and carefully weighed Kennedy's medical evidence and her hearing testimony regarding her daily activities. Specifically, the ALJ found that Kennedy alleged her impairments limited her functional ability to perform basic work activities, due to limited ability to lift, squat, bend, stand, reach, walk, sit, kneel,

23

climb stairs, remember, complete tasks, concentrate, use her hands and get along with others. ECF No. 8-1 at 22. The ALJ found that Kennedy's statements about the intensity, persistence, and limiting effects of her symptoms are only partially consistent with the objective medical evidence. *Id.* at 23.

As such, the ALJ clearly considered and accounted for Kennedy's statements about her pain and its limiting effects but found that her statements were only partially consistent with the medical and other evidence. But the ALJ accounted for the limitations by restricting Kennedy to light exertional level with some additional manipulative restrictions, noting that the modified light residual functional capacity addressed the claimant's bouts of reduced strength, limited range of motion, numbness and tingling in the upper extremities, degeneration of her spine, and neuropathy in her upper extremities. *Id.* at 25. Thus, the ALJ included Kennedy's subjective complaints to the level supported by the medical records and included restrictions in her RFC to account for those limitations. The ALJ substantially complied with the applicable regulatory requirements regarding Kennedy's statements concerning the intensity, persistence, and limiting effects of her symptoms.

A factfinder's evaluation of the credibility of subjective complaints is entitled to judicial deference if supported by substantial record evidence. *Dominguez v. Astrue*, 286 Fed.Appx. 182, 186 (5th Cir. 2008) (citing *Villa*, 895 F.2d at 1024); *see also Harrell,* 862 F.2d at 480. As reflected in the decision denying benefits, the ALJ properly considered Kennedy's testimony regarding her symptoms and limitations,

but found her subjective complaints to be credible only to the extent reflected in the residual functional capacity. *See Crowley,* 197 F.3d at 199.  The ALJ's determination is supported by substantial evidence. *See Nugent v. Massanari*, 275 F.3d 47 (5th Cir. 2001) (citing *Leggett,* 67 F.3d at 564; *Adams v. Bowen,* 833 F.2d 509, 512 (5th Cir. 1987)).

### C.    The ALJ's RFC determination is supported by substantial evidence.

Kennedy argues that the ALJ's RFC determination is not supported by substantial evidence because she failed to properly evaluate the opinions of non-examining state agency consultants, Pihnkston and Bokelberg.  ECF No. 10 at 8. Kennedy contends that the ALJ improperly rejected the agency consultants' opinions as being inconsistent with Kennedy's part-time work.  *Id.* at 9.  Kennedy asserts that the ALJ failed to demonstrate inconsistency "where he[sic] has built no bridge between Kennedy's limited work and the ability to engage in the rigors of sustained full-time work activity."  *Id.*  Kennedy argues this analysis constitutes legal error.  *Id.*

Kennedy further contends that the ALJ engaged in no discussion of the supportability factor as required under the new regulations. *Id.*  Kennedy argues the new regulations require the ALJ to "explain" her findings regarding the supportability and consistency for each medical opinion.  *Id.*  Kennedy further argues the ALJ rejected Pihnkston's opinion without providing an adequate analysis of the consistency and supportability factors.  *Id.* at 10.

On January 18, 2017, the SSA published revised regulations concerning how the agency considers medical opinion evidence in disability determinations.  *See*

*Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 F.R. 5844, 2017 WL 168819 (Jan. 18, 2017). The new regulations provide that, for claims filed on or after March 27, 2017, the Commissioner will no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," including those from treating physicians. 20 C.F.R. § 404.1520c(a); 20 C.F.R. § 416.920c(a). The revised regulations did not retain the longstanding "treating source rule," which requires deference to treating source opinion evidence in absence of certain other specific findings. *See* 20 C.F.R. § 404.1527, 20 C.F.R. § 416.927; *see also Winston v. Berryhill*, 755 Fed.Appx. 395, 402 n.4 (5th Cir. 2018).

Under the new regulations, rather than assigning weight to the medical opinions, the Commissioner must articulate "how persuasive" she finds the medical opinions. 20 C.F.R. § 416.920c(b). And the Commissioner's consideration of the persuasiveness of medical opinions is guided by the following factors:  (1) supportability; (2) consistency; (3) relationship with the claimant (including the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship); (4) specialization of the medical source; and (5) any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1520c(c)(1)-(5); 20 C.F.R. § 416.920c(c)(1)-(5).

"Supportability" and "consistency" are the most important factors. 20 C.F.R. § 404.1520c(b)(2); 20 C.F.R. § 416.920c(b)(2). The ALJ must explain these factors, but she need not expound on the remaining three unless she finds that two or more non-

identical medical opinions are equally well-supported and consistent with the record. *Id.* at § 416.920c(b)(2)-(3).

Furthermore, the fact that a medical source actually examined the claimant or specializes in an area germane to the claimant's medical issues are not primary or dispositive considerations in assessing the medical opinion. *See* 20 C.F.R. § 404.1520c(c); 20 C.F.R. § 416.920c(c). Instead, the persuasiveness of any medical source's opinion—whether that source is a treating, examining, or non-examining physician—depends most significantly on whether the opinion is supported by objective medical evidence and the source's own explanation of the opinion (i.e., the first factor) and the opinion is consistent with other evidence provided by medical sources of record (the second factor). 20 C.F.R. §§ 404.1520c(c), 416.920c(c); *see Williams v. Kijakazi*, 23-30035, 2023 WL 5769415, at *3 (5th Cir. Sept. 6, 2023).

Here, the ALJ noted she considered the medical opinion(s) and prior administrative medical findings in accordance with 20 C.F.R. 404.1520c. In discussing Kennedy's impairments, the ALJ discussed Kennedy's medical history and limitations in assessing her RFC. ECF No. 8-1 at 20. The ALJ determined Kennedy had mild imitations in understanding, remembering, or applying information, mild limitations in interacting with others, and mild limitations in concentrating, persisting, or maintaining pace. *Id.* The ALJ also found Kennedy had mild limitation in adapting or managing herself. *Id.* at 21.

The ALJ considered Kennedy's statements that she maintained the ability to drive a car, prepare a simple meal, shop in stores and online for necessities, and was

not limited in her ability to perform personal care needs, but receives some assistance in completing household chores. *Id.* The ALJ noted the psychological consultants' opinions that Kennedy had mild limitations, but moderate limitations in her ability to adapt and manage herself and finding her depressive severe. *Id.* She observed the psychological consultants' opinions that Kennedy could perform simple to complex tasks, sustain appropriate interaction with the general public and sustain attention in two-hour blocks. *Id.* The ALJ noted the agency consultants' opinions that Kennedy was moderately able to tolerate the stress and demands of a normal forty-hour work week. *Id.* However, the ALJ found the agency consultants' opinions partially persuasive because she found that the moderate limitation in Kennedy's ability to adapt or manage was not consistent with the record showing Kennedy maintained the ability to work part-time in a school setting with children, which required her to care for herself, as well as assist her students. *Id.*

In discussing her consideration of the objective evidence, in addition to Kennedy's statements and reports of record, the ALJ noted that Kennedy's statements concerning the intensity, persistence, and limiting effects of her symptoms were only partially consistent with the objective medical evidence. *Id.* at 23. The ALJ discussed record evidence showing that with conservative treatment, Kennedy maintained the functional ability to perform her daily activities. *Id.* The ALJ again noted Kennedy's Function Report and testimony that should could perform her personal care needs, prepare simple meals, shop online for necessities, maintain finances, attend church, drive a car, and work part-time in a school setting with

28

children as demonstrating that Kennedy had the ability to engage with others on a regular basis, as well as function outside of her home. *Id.* The ALJ observed that the part-time work is not disqualifying but consistent with finding that Kennedy maintained the ability to perform basic work activities. *Id.*

Additionally, the ALJ noted that she cannot defer or give any specific evidentiary weight to any prior administrative medical findings or medical opinions, including those from medical sources. *Id.* at 25. She noted she fully considered the medical opinions and prior administrative medical findings that Kennedy could perform light work with additional manipulative limitations. *Id.* The ALJ found the agency consultants' opinions as persuasive because the limitations are consistent with the record showing the claimant had normal strength, full movement of her extremities and a normal gait. *Id.* However, the ALJ found that the manipulative limitations are supported by the record of her neuropathy, radiculopathy, and degeneration of her cervical spine. *Id.* Thus, the ALJ found that Kennedy's severe impairments and related symptoms limited her to performing the RFC, which is supported by the record medical evidence. *Id.* The ALJ stated she considered all limitations in formulating the RFC, and found that overall the record did not support any greater limitations. *Id.*

Here, the ALJ complied with regulatory requirements in considering the supportability and consistency in determining that agency consultants' medical opinions of Pihnkston and Bokelberg were only partially persuasive. And the ALJ's

RFC determination is supported by substantial evidence.  It is not this court's role to reweigh the evidence.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).

### III.  Conclusion

Because ALJ complied with the regulations in considering the medical opinions and because the ALJ's decision is supported by substantial evidence;

IT IS RECOMMENDED that the final decision of the Commissioner is AFFIRMED, and that Kennedy's appeal be DENIED and DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this Report and Recommendation have seven (7) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within seven (7) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this

____11th____ day of December, 2023.

JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE